# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | |
|---|---|
| RICHARD OSBORN, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 09-3145-CV-S-RED ) |
| CAMPING WORLD RV SALES, LLC, | ) ) |
| Defendant. | ) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In this case, Plaintiff Richard Osborn sued Defendant Camping World RV Sales, LLC ("CW") for retaliation based on comments he made during a sexual harassment investigation. This Court held a bench trial on the 19th and 20th of July, 2010. Based upon a review of the pleadings, the evidence presented at trial, the arguments of counsel, and the record as a whole, the Court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

### Osborn and CW

1. CW is a subsidiary of FreedomRoads, LLC. FreedomRoads and CW are engaged in the retail sale, financing, and service of recreational vehicles and the sale of camping equipment. FreedomRoads' principal place of business and executive offices are located in Chicago, Illinois.

2. In 2008, FreedomRoads had approximately 100 locations.

3. FreedomRoads' dealer network in 2008 included a CW dealer store and retail facility in Strafford, Missouri.

4. On April 18, 2008, Osborn was hired as the Finance Manager for the Strafford, Missouri store. Osborn initially reported to a General Manager, Mark Molder. He was employed

on an at-will basis. As with all new employees, Osborn was subject to a 90 day initial performance review period.

5. The Strafford store also had a Sales Manager, Jeff Harrison; an Office Manager, Patricia Warner; several sales associates, including Jeff Norton and Katrina Alff; retail sales clerks; service technicians; and other hourly employees.

6. Harrison and Warner also reported to Molder. Shortly after Osborn started working as Finance Manager, Molder left the company. No one was directly hired to replace Molder as a General Manager. Instead, Harrison and Osborn became the senior employees on site. Beginning in May 2008, Osborn and Harrison both reported to James Farris, a Regional Vice President who managed a number of other stores. Farris was assigned to oversee the Strafford store's operations, but was not assigned to work onsite in Strafford.

7. As Finance Manager, Osborn's job duties included working with customers and sales associates to complete credit applications and financing contracts, selling financial products to the customers, identifying appropriate lenders, securing approval of financing applications, ensuring that units sold were properly financed and titled, collecting payments from financial institutions and generally managing the financing process. He was expected to comply with company procedures pertaining to the financing and sale of vehicles. Osborn was considered a "keeper of the gate" when it came to matters concerning financing.

8. As a CW employee, Osborn understood he was responsible for following company policies and procedures. Osborn received a copy of the company's Employee Handbook, as well as the guidelines applicable to finance and insurance ("F&I") procedures. The Employee Handbook contained policies prohibiting unlawful harassment and provided that "It is unlawful and against

FreedomRoads' policy to retaliate against an associate for complaining of sexual or other discriminatory harassment or for cooperating in an investigation of a complaint of harassment." The policy contained a description of what was considered unlawful harassment and instructed employees to report any harassment or discrimination.

**Osborn's performance and dismissal**

9. Farris first visited the Strafford store in May 2008. He reviewed the operations there and met with Osborn and Harrison. Farris explained to Osborn that he was the "keeper of the gate" when it came to financial matters at the dealership.

10. Farris had issues with the way Osborn was handling F&I procedures. Farris expressed to Osborn his concerns relating to titles, use of the proper forms, and following F&I procedures. Farris wanted company policies and procedures in place, and they were not in place in May 2008. Osborn insisted he had been trained on F&I procedures and that he knew the acceptable ways of conducting business, notwithstanding what Farris wanted. Farris also admonished Osborn for using inappropriate language.

11. During Farris' May visit to the Strafford store, Osborn did not discuss with Farris any alleged inappropriate behavior of Harrison.

12. Osborn witnessed Harrison engage in inappropriate behavior toward Alff. However, Osborn did not report any such conduct to Human Resources pursuant to CW's policy.

13. On or about June 30, 2008, Alff was dismissed for unsatisfactory sales performance. Shortly thereafter, Alff called Human Resources and complained that Harrison sexually harassed and discriminatorily dismissed her. She also claimed that Harrison engaged in financial misconduct. At the request of Human Resources, Alff reduced her complaints into a written document. In the

3

letter, Alff made several complaints about Harrison and asserted he should not have dismissed her. Alff alleged that while she was at work Harrison would touch her backside and make inappropriate comments; that Harrison allowed employees to improperly fill up their own cars with gasoline on the company account; and that Harrison manipulated the payment of commissions, bonuses, and spiffs for personal gain and to pay off personal debts.[1]

14. In July 2008, CW also received an anonymous letter that claimed Harrison had engaged in certain financial irregularities and had violated company policy. This included allegations that Harrison allowed employees to use a company account at a local gas station to fill-up their gasoline tanks, awarded spiffs and other commissions in a manner designed to pay off personal loans, had employees perform personal services for him on company time, and made sexually inappropriate comments.

15. Human Resources reviewed these two letters and contacted Farris to discuss the issue. Farris had already planned a visit to the Strafford store that would include an audit by the new Area Controller, Denyse Jones Farris ("Jones Farris"). Farris and Ginger Thomas, Human Resources Manager, agreed that Thomas would conduct her investigation while Farris was onsite.

16. Thomas visited the Strafford store in mid-July 2008 to investigate the complaints made about Harrison. Her investigation covered not only the alleged sexual harassment, but also the claims that Harrison engaged in various financial irregularities and violated company policy.

17. While this investigation was being conducted, Jones Farris reviewed and audited the financial transactions and books and records of the Strafford store. As part of this process, Jones

---

[1] A spiff is extra money paid to a salesperson to sell certain merchandise aggressively; it is intended to reward successful selling.

Farris asked Osborn questions about the F&I paperwork she had reviewed and some F&I complaints.

18. Jones Farris identified several issues with Osborn's performance. There were issues with placing negative equity numbers on contracts, failing to properly document financing and sales transactions, allowing a vehicle to leave the lot before the financing transactions had been properly completed and submitted, improperly completing financing and sale documents by failing to obtain customer signatures and verify income, and allowing a customer to leave the lot with dealer plates without completing the financing transaction. In some instances, the bank that was supposed to finance the transaction would not fund the sale because Osborn failed to properly complete the paperwork. The delay in securing financing for the sale and payoff of the floor plan loan for the vehicle not only cost CW interest, but it was contrary to the terms of the floor planning arrangements with the vehicle. In another instance where the F&I manager failed to properly prepare financing documentation in a similar manner, the F&I manager was dismissed.

19. When confronted with the first issue of submitting a deal with negative equity, Osborn explained that this was the only time he had submitted a negative equity deal. Soon thereafter, it was discovered that another sale had not been financed because Osborn had submitted a negative equity contract. Around the same time Farris learned of another issue that Osborn was partly responsible for. A buyer was allowed to leave the lot with a vehicle carrying dealer plates before the sales and financing transactions were complete, thus exposing CW to considerable risk of loss. Osborn was responsible for reviewing all the paperwork before it was submitted to the bank to be certain it was correct, and failed to do so.

20. These were all serious deficiencies in performance for an F&I Manager, and the

problems were complicated by Osborn's insistence that he knew what he was doing and that he knew the right way to do things.

21. CW also learned during the investigation that Osborn had used profanity on more than one occasion and knew about Harrison's use of company resources for personal gain. Osborn never reported Harrison's misconduct.

22. Osborn did not have an F&I menu on his computer. The F&I menu is a sales tool used to offer products to customers. Without the F&I menu, the same products could be offered to customers and tracked on plain white paper. The absence of the F&I menu on Osborn's computer did not in any way materially impact Osborn's ability to perform his job. Osborn successfully sold products without using the F&I menu.

23. After conducting her audit of the finance department, Jones Farris reported her findings to Farris. In particular, she reported to Farris that Osborn had made mistakes. She also told Farris what Osborn had said when confronted with his mistakes.

24. While this audit was being conducted by Jones Farris, Thomas was conducting her investigation.

25. As part of her investigation, Thomas met with the CW employees identified in the anonymous letter and Alff's letter, including Osborn. A total of six employees were interviewed. Of the six, only Osborn was terminated.

26. Thomas' investigation covered not only the allegations of sexual harassment, but also the serious allegations of financial irregularities and failure to follow company policy. The interview of Osborn, as with the interview of the other five employees, covered a range of financial and business irregularities, violations of policy, and complaints of inappropriate comments.

27. Thomas interviewed Harrison before visiting the location and he denied the allegations.

28. The great majority of Alff's claims could not be corroborated by Thomas. However, Jeff Norton provided specific information that Harrison had borrowed money from him and that Harrison had teased him about what he and Alff had been doing when the two of them went out into the sales lot. Norton also confirmed he had loaned Harrison $400. Norton was not dismissed.

29. On July 15, 2008, after Osborn met with Jones Farris, Thomas interviewed Osborn. Osborn corroborated the allegation about Harrison using a spiff to pay off a personal loan to Norton. He also said Harrison had questioned a male sales associate and Alff about what they had been doing in the sales lot and where they had been. Osborn also corroborated other instances of inappropriate conduct by Harrison toward Alff. The interview was the first time Osborn disclosed Harrison's misconduct to a superior.

30. After the audit and Thomas' interviews were complete, Farris, Thomas, and Jones Farris held a telephone conference with three other CW employees from CW's corporate office. The results of the audit and investigation were discussed and Farris decided to terminate Harrison and Osborn for lack of confidence.

31. Osborn was dismissed on July 18, 2008 because CW no longer had confidence in Osborn's ability to manage the finance department. He was a new employee who had substantial problems with the manner in which he performed his duties. Not only had he failed to secure payoffs on loans in a timely manner, but he had allowed at least one vehicle to leave the lot with dealer plates before the sale was financed and completed.

32. CW demonstrated that Osborn was dismissed for legitimate business reasons. In particular, CW lacked confidence in Osborn's ability to follow management direction and abide by company policies, as demonstrated by his performance. This included Osborn's failure to follow proper procedures in the documenting and handling of sale and financing transactions, delays in securing payoffs on loans, resistance to following instructions and procedures, and continued use of inappropriate language. This was considered particularly unacceptable from a new hire who was still within his initial 90 day performance review period.

33. Osborn's failure to handle all sales and financing transactions properly exposed CW to a risk of loss and liability.

34. The issues with Osborn's performance were first noted by CW management in May 2008, months prior to CW's receipt of Alff's allegations against Harrison and prior to Osborn meeting with Thomas to discuss the allegations.

35. CW's witnesses credibly testified that neither Osborn's participation in the investigation nor any information he provided was a contributing factor to the decision to dismiss him. To the contrary, those involved in the decision credibly testified that Osborn's comments did not play any role in his dismissal.

36. The only evidence Osborn produced showing his termination was related to his comments in the internal investigation was that his dismissal came in close proximity to his interview with human resources. He met with Thomas on Tuesday, July 15, 2008 and was terminated Friday, July 18, 2008.

37. Osborn's contributions to the investigation of Harrison did not in any way contribute to CW's decision to dismiss Osborn. Harrison was dismissed, and there was no interest or motive

in protecting him or retaliating against Osborn for turning in Harrison. Norton also provided corroborating evidence and he was not dismissed. It was Osborn's unsatisfactory performance, and not his participation in the investigation, that resulted in his dismissal.

## CONCLUSIONS OF LAW

1. Osborn filed suit asserting claims under the Missouri Human Rights Act ("MHRA"), alleging CW retaliated against him because he corroborated some of the allegations made by Alff.

2. Because Osborn's suit is brought under the MHRA, Missouri law applies. Courts review MHRA retaliation claims under the *McDonnell Douglas* burden-shifting analysis if, as in this case, there is no direct evidence of discrimination. *Dovenmuehler v. St. Cloud Hosp.*, 509 F.3d 435, 439 n. 4 (8th Cir. 2007) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)); *Reed v. Rolla 31 Pub. Sch. Dist.*, 374 F. Supp. 2d 787, 806 (E.D. Mo. 2005); *Eliserio v. United Steelworkers of Am. Local 310*, 398 F.3d 1071, 1078 (8th Cir. 2005).

3. The plaintiff must first present a *prima facie* case of retaliation; next the defendant must offer a legitimate, non-discriminatory reason for its challenged behavior; and finally the plaintiff must show the defendant's proffered reason was pretextual. *Eliserio*, 398 F.3d at 1078.

### Osborn failed to make a *prima facie* case of retaliation

4. To make a *prima facie* case, Osborn must show "(1) he engaged in protected conduct . . .; (2) he suffered an adverse employment action; and (3) the adverse action was causally linked to the protected conduct." *See id.* at 1078-79.

5. Ultimately, the burden is on Osborn to establish by a preponderance of the evidence that CW violated the MHRA by terminating his employment. *See Karcher v. Emerson Elec. Co.*,

9

94 F.3d 502, 507 n. 2 (8th Cir. 1996) (stating "the plaintiff assumes the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff").

6. Osborn engaged in protected conduct if he "opposed any practice prohibited by [the MHRA]. . . ." MO. REV. STAT. § 213.070(2) (2010). An employee may engage in protected conduct by making an internal complaint. *See Buettner v. Arch Coal Sales Co., Inc.*, 216 F.3d 707, 711, 714-15 (8th Cir. 2000). Osborn engaged in protected activity because the comments he made during the investigation opposed sexual harassment in the workplace, which the MHRA prohibits.

7. Osborn claims his dismissal and participation in CW's internal investigation are related based on the proximity of the two events. Osborn presented no other competent evidence that the two events are connected.

8. The causal link "may be proved circumstantially by showing the discharge followed the protected activity so closely in time as to justify an inference of retaliatory motive." *Buettner*, 216 F.3d at 715-16. However, generally there must be more than a temporal connection to present a fact issue on retaliation. *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999).

9. Osborn produced evidence that his interview with human resources was a few days prior to his dismissal.

10. Osborn cannot point to any statement or other conduct by Farris, Thomas, or any other corporate employee that would evidence an intention to retaliate against him for his comments.

11. Osborn's argument that the timing between his meeting with Thomas and his termination demonstrates a causal connection is fatally undercut by the fact that no other employee who was interviewed by Thomas was dismissed, including an employee who corroborated some of Alff's sexual harassment allegations. The only two employees who were dismissed were Harrison

and Osborn. Osborn can point to no evidence demonstrating any motive or intent to retaliate against him for "turning in" Harrison or for what he told Thomas. In fact, the dismissal of Harrison demonstrates there was no intent to protect Harrison – only an intent to place responsible individuals in control of the management of the store.

12. Any attempt to show Osborn's comments and the dismissal are causally connected is further undercut by the fact that during the same time the investigation was occurring, Jones Farris was conducting an audit that unraveled several deficiencies in Osborn's performance. Osborn's performance issues lead to his dismissal, and the decision was unrelated to his involvement in the internal investigation. *See Valdez v. Mercy Hosp.*, 961 F.2d 1401, 1403 (8th Cir. 1992) (finding no causal connection between protected activity and discharge when the employee was not performing his job satisfactorily).

13. Osborn alleges CW had a motive to terminate him because he was a management level employee who would have a lot of credibility when he testified in favor of Alff on her sexual harassment claim. Osborn argues that CW terminated him to destroy his credibility as a corroborating witness. This is way too big a stretch for the logic of this Court. It would seem more logical to infer that absent other reasons, CW would keep Osborn as an employee in order to keep him friendly with CW in the event he was required to testify regarding Alff. Osborn has failed to establish a *prima facie* case of retaliation.

**Osborn did not prove CW's proffered reasons were pretexts for discrimination**

14. In any event, Osborn cannot meet his burden of proving that CW's proffered reason was a pretext for retaliation. "An employee who engages in protected activity is not insulated from adverse action for violating workplace rules, and an employer's belief that the employee committed

misconduct is a legitimate, non-discriminatory reason for adverse action." *Richey v. City of Independence*, 540 F.3d 779, 784 (8th Cir. 2008) (citing *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc)). "[T]he employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995) (citations omitted).

15. In this case, CW articulated legitimate, non-discriminatory business reasons for Osborn's dismissal. In particular, Farris lacked confidence in Osborn's ability to follow management direction and abide by company policies. This lack of confidence came from the determination that proper procedures had not been followed in the handling of certain sales and financing transactions. Overall, Osborn was not satisfactorily performing his duties and was resistant to following instructions. Osborn had also continued to use inappropriate language. This was hardly the type of conduct expected from a new employee.

16. Once the employer identifies a legitimate, non-discriminatory reason for terminating the employee, the burden shifts to the employee to show that the employer's justification was unworthy of credence. *Smith v. Allen Health Sys.*, 302 F.3d 827, 833-34 (8th Cir. 2002).

17. Evidence of pretext is viewed in light of the employer's justification. *Smith*, 302 F.3d at 834. Osborn has not shown that CW's justification is not worthy of credence.

18. First, Osborn's performance issues preceded CW's knowledge of allegations of inappropriate conduct or poor business practices in the Strafford store. Osborn's performance issues were first observed by Farris in May 2008. At that time, Farris counseled Osborn about the use of

inappropriate language, and instructed him to follow proper procedures for sale and financing transactions. Farris scheduled an audit of the finance department for July following his May 2008 visit. When the audit was conducted, additional performance issues were discovered. Two months after being instructed to follow CW's policies and procedures, the audit revealed multiple instances where Osborn failed to follow CW's policies and procedures and Osborn seemed unwilling to change that behavior. When another F&I Manager committed similar infractions, that manager was dismissed.

19. Second, any argument that Osborn's comments about Harrison's sexual harassment of Alff caused his dismissal is not credible given the serious deficiencies in Osborn's performance, the dismissal of Harrison, and the failure to dismiss Norton, who also corroborated some of Alff's allegations. *See Wittenburg v. Am. Express Fin. Advisors, Inc.*, 464 F.3d 831, 837 (8th Cir. 2006) (plaintiff failed to demonstrate that employer's proffered non-discriminatory reason for employee's termination was pretextual when several other members of the protected class were not dismissed).

20. Osborn's assertions that CW's reasons are pretextual do not meet his ultimate burden of proof. Osborn's claim that he did not have the appropriate tools does not persuade the Court that CW's explanation is pretextual because the absence of the tools in question did not cause any of Osborn's mistakes. Even if there was a software glitch that caused one of the forms to print out a box erroneously, Osborn was responsible for reviewing the forms to be certain they were correct and complete. The deficiencies in performance that resulted in Osborn's dismissal related to fundamental and basic failures in following procedures for financing and sales transactions, being certain all paperwork was correct and complete, securing pay-offs in a timely manner, and ensuring all sales transactions were properly titled and complete.

21. In sum, Osborn's claim against CW fails because Osborn did not establish his termination was causally linked to his comments, and in any event failed to show that CW's proffered reason was a pretext for retaliation.[2]

**IT IS SO ORDERED**.

DATED: August 11, 2010

*/s/ Richard E. Dorr*
RICHARD E. DORR, JUDGE
UNITED STATES DISTRICT COURT

---

[2] Because the Court finds Osborn did not prove his case, the Court does not reach the issues related to damages.